AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Jose Emmanuel Torres<br><br>_____<br>Defendant(s) | ) ) ) ) ) ) )  Case No. 14-6041-SNOW |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __5/15/2013 through the present__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 201 (b)(2)(A) and (B) | A public official who corruptly demands, accepts or agrees to accept anything of value in return for being influenced in the performance of any official act or for being influenced to commit a fraud on the United States. |
| Title 18 U.S.C. § 1030(a)(2)(B) and (c)(2)(B)(i) and (ii) and 2 | Intentionally exceeding authorized access to a computer and thereby obtain information from any department or agency of the United States. |
| Title 18 U.S.C. § 1951 | Attempting to obtain property from others with consent under color of official right and which affected interstate commerce. |

This criminal complaint is based on these facts:

See Affidavit Attached

☒ Continued on the attached sheet.

_____
Complainant's signature

FBI SA Mario Tariche
Printed name and title

Sworn to before me and signed in my presence.

Date: ___01/31/2014___

_____
Judge's signature

City and state: __Ft. Laud., Florida__

U.S. Magistrate Judge Lurana S. Snow
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Your Affiant, Mario Garcia Tariche, a Special Agent with the Federal Bureau of Investigation, United States Department of Justice, having been duly sworn, deposes and states the following:

1. Affiant is a Special Agent of the Federal Bureau of Investigation (hereinafter referred to as "FBI") assigned to the Miami, Florida Field Division. Affiant has been employed as a Special Agent of the FBI since December, 1991. Affiant's current assignment is to a squad investigating public corruption. It is part of Affiant's duties to investigate allegations of bribery involving Federal public officials. Affiant speaks fluent Spanish.

2. This affidavit is provided for the limited purpose of establishing probable cause to support this criminal complaint. Affiant has not included all the details of this investigation, but rather has set forth only those facts Affiant believes are necessary to establish probable cause. The information in this affidavit is based on Affiant's personal knowledge, as well as, information Affiant has obtained from other law enforcement agents and officers, a cooperating witness (hereinafter referred to as "CW"), other witnesses, and from a review of documents obtained during the course of the investigation.

## VIOLATIONS OF THE LAW

3. The facts and circumstances set forth below in this affidavit demonstrate that there is probable cause to believe Jose Emmanuel TORRES (hereinafter referred to as "TORRES") committed the following offenses:

    a. Federal Bribery, in violation of Title 18, U.S.C. §201(b)(2)(A) and (B);

b. Exceeding Authorized Access to a Government Computer, in violation of Title 18, U.S.C. §1030(a)(2)(B) and (c)(2)(B)(i)and (ii) and Title 18, U.S.C. §2; and

c. Extortion Under Color of Official Right, in violation of Title 18, U.S.C. §1951.

## BACKGROUND

4. TORRES is currently assigned as an Intelligence Officer to the United States Marine Corps Forces, South, under the United States Southern Command. His duties include collecting information regarding persons who are allegedly involved in terrorism and drug trafficking. From approximately January 2012 through December 13, 2013, TORRES was assigned to the Department of Defense, Defense Intelligence Agency (hereinafter referred to as "DIA"). As part of his official duties with the DIA, TORRES worked with agents from Department of Homeland Security, Immigration and Customs Enforcement (hereinafter referred to as "ICE") Agents and the Drug Enforcement Agency (hereinafter referred to as "DEA") collecting intelligence regarding persons who were allegedly involved in terrorism and drug trafficking. At DIA TORRES participated in interviews of individuals incarcerated at various Federal immigration detention centers located in Southern Florida.

5. On or about January 23, 2012, a CW currently cooperating with the FBI was interviewed by ICE Agents at the Krome Federal Immigration Detention Center located in Homestead, Florida. TORRES was present with ICE Agents during the January 23, 2012, interview of CW. CW had been arrested by ICE Agents on January 18, 2012, for alleged immigration violations. CW had pending litigation with ICE. The CW had been trying to obtain permanent legal status. ICE Agents and TORRES conducted several interviews of CW at Krome subsequent to his arrest. Approximately eleven days after the arrest, CW was released on bond pending an immigration hearing.

6. While CW was out on bond, TORRES met CW on several occasions attempting to obtain information regarding persons allegedly involved in drug trafficking and terrorism. In approximately April 2012, according to CW, TORRES appeared at CW's residence. The meeting was unauthorized as TORRES had not notified DIA that he was conducting an interview at the residence of a witness or a confidential informant. TORRES requested that CW enter his vehicle to talk. TORRES was driving his personally owned Lincoln Navigator. During the meeting, TORRES asked CW for a $5,000.00 loan. TORRES advised that he was having marital and financial problems. CW told TORRES that he could not provide TORRES with money as the CW had extensive legal bills associated with his pending immigration case. After the April 2012 meeting, CW had no contact with TORRES for an extended period of time.

7. On or about December 7, 2012, CW was arrested by ICE Agents prior to his scheduled immigration hearing on December 18, 2012. CW was again incarcerated at the Krome Federal Immigration Detention Center. CW was held in custody at Krome pending another immigration hearing scheduled for February, 2013. CW subsequently won the February hearing, however, the government appealed the decision which resulted in CW remaining in custody. In approximately March 2013, ICE Agents and TORRES interviewed CW at KROME regarding persons involved in terrorism. Several additional interviews of CW were conducted by ICE Agents and TORRES over the next several months. On May 15, 2013, CW was moved to the Glades County Federal Immigration Detention Center in Moore Haven, Florida.

8. While CW was incarcerated at Glades, he was interviewed by TORRES. According to CW, TORRES arrived at Glades by himself, and he was not accompanied by ICE Agents for the interview. During the interview, TORRES asked CW if he still had drug trafficking contacts in Costa Rica and Miami. TORRES advised that he was looking to conduct a robbery of a

3

delivery of drug money or identify a stash house where drug money was stored. TORRES stated that he would discuss this matter further with CW after he was released from custody.

9. On or about August 15, 2013, CW was again released on bond. Several days after he was released from custody, CW was contacted by TORRES. CW subsequently agreed to meet TORRES in the parking lot of a medical plaza located in Weston, Florida. According to CW, TORRES discussed the pending Federal immigration case against CW. In early September 2013, TORRES met with CW again at the medical plaza in Weston, Florida. When CW drove to the medical plaza, he was accompanied by a Private Investigator (hereinafter referred to as "PI") who worked with an attorney representing CW. CW and PI picked up TORRES at the medical plaza and drove him back to CW's residence. During a conversation at CW's residence, in the presence of PI, TORRES stated that he was responsible for having TORRES arrested on December 7, 2012. TORRES advised that he used his influence with ICE to have CW arrested prior to his hearing.

10. On or about September 27, 2013, CW had a birthday party at his residence for his son. PI was also present at the birthday party. TORRES appeared at the party for an unauthorized meeting with CW. According to CW, during a conversation with TORRES at the party, TORRES complained that he was having financial problems, and that he was not making enough money as a United States Marine. Several days after the birthday party, TORRES requested to meet with CW again at the medical plaza near CW's residence. According to CW, during the meeting TORRES asked CW for ten thousand dollars. TORRES did not say the money he was requesting was a loan. When TORRES asked for the money, he continued to discuss the pending Federal immigration case against CW. CW understood TORRES to be asking him for money, or he would use his influence with ICE to have CW arrested again.

4

Following the meeting, CW contacted the DEA to report that TORRES was asking him for money. The DEA subsequently referred the information to the FBI Miami Division for investigation of CW's allegations against TORRES.

### **WhatsApp Text Messages**

11. During an interview while CW was incarcerated, TORRES advised CW to communicate with him utilizing a cellular telephone application named "WhatsApp", which is used to send text messages not saved on servers by cellular telephone providers. CW provided the FBI with a copy of all WhatsApp text communications between TORRES and CW starting on or about October 5, 2013. On or about October 8, 2013, the following text messages were sent between CW and TORRES in the Spanish language translated by the FBI Miami Division Language Services Section:

> TORRES: They have not told me anything yet.
>
> CW: About what my brother? I don't understand you. The documents you mentioned, when do you need them?
>
> TORRES: What documents? About calls and the DEA.
>
> CW: I'm telling you no less than 10. OK we'll meet when the DEA calls you.
>
> TORRES: I do not understand the thing of the 10.
>
> CW: Pal, you told me that you were worried, that you need 10 thousand dollars within a month. I do not have the whole thing. That amount, one part.
>
> TORRES: Start making contacts with everybody in Costa Rica, Santo Domingo, PR, Colombia, here and wherever you have the most.

12. The following WhatsApp text messages were sent between CW and TORRES on October 15, 2013:

5

>TORRES:  Brother forgive me for asking, but do you know anything can be done about the 10.  I do not have a car and I can't do anything.
>
>CW:  Yes I think that next I can come up with the 10.  I am on it.
>
>TORRES:  If you can manage it, I will be in your debt for life.  I am in very bad shape
>
>CW:  Give me a few days.  I think so.  Relax.

13. The following WhatsApp text messages were sent between CW and TORRES on or about October 21, 2013:

>TORRES:  Let me know if you can do something about the 10 because I have a meeting on Monday about that.
>
>CW:  Relax, I will keep my promise about the 10, Right now I am getting 20 thousand, Give me 30 minutes.
>
>TORRES:  Brother, if you can help me with this, I promise that you will not go to jail even if I have to put my neck on the line.

14. The following WhatsApp text messages were sent between CW and TORRES on November 4, 2013:

>TORRES:  Ohh ok then we'll meet in the evening. Do you know anything about the 10?
>
>CW:  Yeah, cool it, I keep my word, I am going to give them to you, relaxxxxx, Count on those 10.
>
>TORRES:  I do not want to rush you or annoy you, I have never been in a situation like I am in now.  I am even embarrassed.  Do you like when?
>
>CW:  Yes, I'll tell you tomorrow the day and time because I do not want to let you down; if I do not have the whole amount, at least a good part, remember that I also have to pay the lawyer.

## Bribe Payment and Recorded Meetings

15. On or about November 5, 2013, CW and TORRES communicated via WhatsApp to set up a meeting at the Weston Commons shopping center located in Weston, Florida. Prior to the meeting, CW was provided with recording devices, and a physical surveillance of the meeting was conducted by the FBI. During the recorded meeting in the Spanish language, CW and TORRES had a conversation regarding the planned robbery. TORRES assured CW that the individuals who will assist him in the robbery are trustworthy. CW stated that he was not going to leave TORRES hanging with the "ten." CW asked if $6,000 was okay at this time due to the fact that CW had legal expenses. TORRES stated that yes, of course, $6,000 would be fine. CW and TORRES subsequently had a conversation regarding details of the planned robbery. CW and TORRES then agreed to discuss the robbery further on a Skype call so that TORRES could talk with a contact of CW who would be involved in planning the robbery.

16. On or about November 14, 2013, CW and TORRES communicated via WhatsApp to set up a meeting at the parking lot of the T.G.I. Friday's restaurant located at 15551 Sheridan Street, Davie, Florida. Prior to the meeting, CW was provided with recording devices, and a physical surveillance of the meeting was conducted by the FBI. During the recorded meeting in the Spanish language, CW and TORRES discussed the pending Federal immigration case against CW. CW asked TORRES for assistance in his case, and he asked TORRES for assistance in obtaining a driver's license. CW then provided TORRES with an envelope containing $6,000. The aforementioned $6,000 was provided to CW by the FBI prior to the meeting. The $6,000 was obtained by the FBI from a federally insured financial institution that does business in interstate commerce. When CW handed the envelope to TORRES he stated, "I took 3,900 for myself and I brought you 6 thousand dollars, but help me with that." CW and

7

TORRES subsequently had a conversation regarding the robbery and the need for TORRES to check the names of two Colombians who will be involved in the robbery. CW stated, "So that you....Do you have a way of getting us into the system to check everything out before..." TORRES responds, "Yeah-yeah-yeah-yeah..." CW advised that he would send TORRES the names next week. CW and TORRES continued to discuss CW's immigration case. TORRES stated that he would check with the government attorney assigned to the case to obtain information.

17. On November 20, 2013, TORRES sent CW a message via WhatsApp asking if CW had the names TORRES needed to check. TORRES provided CW with the email jsixxer01@gmail.com with the password to send him the names.

18. On or about November 21, 2013, under the supervision of FBI Special Agent (hereinafter referred to as "SA") Kyle S. Scheatzle, CW accessed the draft folder of the email account provided by TORRES. CW prepared a draft listing the names of the two Colombian individuals that TORRES needed to conduct checks on. The names provided to TORRES were subjects of current DEA and FBI investigations involving money laundering and drug trafficking. Screen captures were taken by the FBI of the account's home page, draft folder, and the draft message created by CW.

19. On or about November 25, 2013, CW and an FBI Confidential Human Source (hereinafter referred to as "CHS") contacted TORRES via the Skype internet application. The Skype conversation in the Spanish language between CW, CHS, and TORRES was recorded by the FBI. During the recorded conversation, CW, CHS, and TORRES discussed the details of the planned robbery. The money to be stolen would be transported in a car that will be left in a

8

shopping center. TORRES agreed to provide a law enforcement receipt that would document that the money had been seized when, in fact, the money had been stolen. CW and CHS would then be able to tell the owners of the money in Colombia that the money was seized. The following conversation took place during the planning of the robbery:

CW: "So one thing that worries him is the following: Do you remember that in Glades, in Glades or in, when, when, you came to visit here or, I don't remember where, you told me you would give him a receipt so they could show it over there to the, to the owners of the, of the money down in Colombia."

TORRES: "if they are given a receipt but since, let me see… if I detain you, you have that money. I confiscate the money from you and there is a receipt."

20. On or about December 1, 2013, TORRES sent CW a message via WhatsApp telling CW to access the email account, because he had a few questions about the robbery he needed answered. On December 2, 2013, Affiant accessed the Gmail account provided by TORRES. CW advised that TORRES had prepared a draft with questions to ask CHS about the robbery. Affiant reviewed the draft which contained seven questions about the robbery. TORRES wanted specific details about the vehicle and the route the vehicle would travel during the robbery. Screen captures were taken by the FBI of the account's home page, draft folder, and the draft message created by TORRES.

21. On or about December 2, 2013, TORRES sent messages to CW via WhatsApp regarding the results of the checks he conducted on the two Colombian names provided to TORRES. TORRES advised that one of the names was a subject of a DEA investigation. TORRES further advised that the individual named "Carlos" was not a DEA informant, but the DEA was watching him. Subsequent investigation by DEA officials confirmed that variations of the names provided to TORRES had been run on Federal Government databases.

9

22. On or about December 4, 2013, CW and TORRES communicated via WhatsApp to set up a meeting at the parking lot of the Walmart Supercenter located at 4700 S. Flamingo Road, Cooper City, Florida. Prior to the meeting, CW was provided with recording devices, and a physical surveillance of the meeting was conducted by the FBI. During the recorded meeting in the Spanish language, CW and TORRES discussed details of the planned robbery. CW asked TORRES to provide him with a photograph of the individual named "Carlos," who TORRES had previously advised was a DEA subject, so they could make sure it was the same person. Additionally, TORRES was told that the money to be stolen came from drug traffickers and money launderers. CW and TORRES then discussed different ways that the money could be laundered.

23. On or about December 6, 2013, TORRES sent a series of WhatsApp messages to CW regarding "Carlos." CW asked TORRES is he was able to obtain a photograph of "Carlos." TORRES proceeded to send two photographs via WhatsApp of individuals he identified as "Carlos." One of the photographs sent by TORRES was the correct photograph of the "Carlos" whose name was provided to TORRES, and who was the subject of a DEA investigation. The photographs sent by TORRES were subsequently downloaded by the FBI and maintained as evidence.

24. On or about January 7, 2014, TORRES sent a series of messages to CW utilizing the Blackberry Messenger (hereinafter referred to as "BBM) cellular telephone application requesting that CW provide him with the names of two additional individuals associated with CW who would be involved in the robbery. TORRES requested that CW send the names to him using the "secret" email account.

25. On or about January 8, 2014, under the supervision of Affiant and SA Kyle S. Scheatzle, CW accessed the "secret" email account jsixxer01@gmail.com previously provided by TORRES. CW prepared a draft listing the names of two additional individuals involved in the robbery that TORRES needed to conduct checks on. Screen captures were taken by the FBI of the account's home page, draft folder, and the draft message created by CW.

26. On or about January 9, 2014, CW sent TORRES a BBM message requesting a copy of the receipt that TORRES was to provide after the robbery. TORRES agreed to provide a copy of the receipt.

27. On or about January 10, 2014, TORRES sent CW a BBM message containing two attachments. The first attachment was what appeared to be a Department of Justice property receipt or seizure of assets form. The second attachment was a list of seized assets from a DEA case. Affiant reviewed all the BBM messages between TORRES and CW contained on CW's cellular telephone. Affiant subsequently provided CW's cellular telephone to the FBI Miami Division Computer Analysis Response Team for downloading and examination.

28. On or about January 14, 2014, CW and TORRES communicated via BBM to set up a meeting at the parking lot of the Publix Supermarket located at 225 South Flamingo Road, Plantation, Florida. Prior to the meeting, CW was provided with recording devices, and a physical surveillance of the meeting was conducted by the FBI. During the recorded meeting in the Spanish language, CW and TORRES discussed the final details for the robbery. CW advised that a vehicle containing $500,000 would be traveling down soon. CW stated there would be other money deliveries possibly totaling $5,000,000, but this delivery would be $500,000. CW told TORRES that he needed to be careful with the money, because the money

11

would be in small denominations. TORRES agreed to seize the vehicle containing $500,000. CW advised that the share for TORRES would be $250,000. TORRES agreed to provide a receipt to CW that would show the money was seized. CW and TORRES then discussed further details of the robbery.

29. On or about January 25, 2014, CW and TORRES communicated via BBM regarding the vehicle that was to be used to transport the money. CW wrote that the rental vehicle would be a 2012 Chevrolet Malibu, tan in color, with a Texas tag number D89X118, and that TORRES needed to write the amount of money and the date on the receipt. TORRES further wrote that this week he would be going to get together with somebody "big" at Krome to discuss CW's immigration case. TORRES also stated that he mentioned CW's immigration case, without using his name, to various important people at Krome in order to see how the case could be fixed. TORRES then wrote that CW should not mention anything to his attorneys.

30. On or about January 29, 2014, CW and TORRES communicated via BBM to set up a meeting at the parking lot of the Publix Supermarket located at 225 South Flamingo Road, Plantation, Florida. Prior to the meeting, CW was provided with recording devices, and a physical surveillance of the meeting was conducted by the FBI. During the recorded meeting in the Spanish language, TORRES provided CW with an envelope containing a DEA seizure report. TORRES put on plastic gloves when he removed the form from the envelope. TORRES warned CW not to touch the form, only the envelope, to avoid getting his fingerprints on the envelope. TORRES advised CW to burn the envelope after he provided the report to CHS. After receiving the report from TORRES, CW advised that $250,000 would be paid to TORRES by CHS for TORRES providing him with the DEA seizure report. The seizure report provided by TORRES was a four-page DEA seizure form with sections that were handwritten

and sections that were typed. The DEA seizure report falsely documented that a bulk cash seizure in the amount of $500,000 was seized by the DEA from a 2012 Chevrolet Malibu on January 31, 2014. The DEA seizure report provided by TORRES further falsely documents that the cash seizure was the result of profits from an illegal drug trafficking business in and around the North Atlantic area. After the meeting, CW provided the form to the FBI which will be maintained for evidentiary purposes by the FBI Miami Division Evidence Control Unit.

31. During the above-referenced recorded meeting on or about January 29, 2014, CW asked TORRES if there was any new information regarding his immigration case. TORRES responded that he attempted to make contact with ICE Agents, but they were busy and could not meet with him. TORRES advised that he wanted to check on CW's case and requested that the ICE Agents conduct checks on the Chevrolet Malibu rental car, but they were very busy. TORRES and CW also discussed that on January 31, 2014, CW was going to take possession of the Chevrolet Malibu rental car containing the $500,000. CW advised that once he had the car and the money, he would call TORRES to meet him at a location so that TORRES could pick up his share of the money. CW further advised that once he called TORRES with a location, TORRES needed to appear quickly to pick up his share of the money. CW stated that TORRES' share, which would be $250,000, would be in a duffle bag.

32. On January 31, 2014, Affiant provided CW with a black duffle bag containing $235,000 in United States currency. The currency and the duffle bag were photographed by the FBI for evidentiary purposes prior to being provided to CW. CW subsequently contacted TORRES via BBM and told TORRES to meet him in the parking lot near Bass' Pro Shops, in Dania, Florida, in order for TORRES to pick up the duffle bag containing TORRES' share of the proceeds of the allegedly seized drug money. CW was in the Chevrolet Malibu rental car

13

that was equipped by the FBI with audio and video recording equipment. A physical surveillance of the meeting was conducted by the FBI. At approximately 10:30 a.m., TORRES was observed approaching the Chevrolet Malibu rental car parked in the parking lot near Bass' Pro Shops. CW was subsequently observed providing TORRES the duffle bag containing TORRES' share of the allegedly seized drug proceeds.

33. Based upon the aforementioned facts, your affiant submits that there is probable cause to believe that TORRES committed the following offenses: Federal Bribery, in violation of Title 18, U.S.C. §201(b)(2)(A) and (B); Exceeding Authorized Access to a Government Computer, in violation of Title 18, U.S.C. §1030(a)(2)(B) and (c)(2)(B)(i) and (ii) and Title 18, U.S.C. §2; and Extortion Under Color of Official Right, in violation of Title 18, U.S.C. §1951.

FURTHERMORE AFFIANT SAYETH NOT

MARIO GARCIA TARICHE
SPECIAL AGENT
Federal Bureau of Investigation

Sworn and subscribed to before me
this 31st day of January, 2014,
at Ft.Laud, Florida

LURANA S. SNOW
United States Magistrate Judge

14

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 14-6041-CR-SNOW

## BOND RECOMMENDATION

DEFENDANT: JOSE TORRES

$250,000 Corporate Surety with a Nebbia Requirement
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   JEFFREY KAPLAN

Last Known Address: _____

What Facility: _____

Agent(s):   FBI S/A MARIO TARICHE
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)