UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 14-60092CR - Rosenbaum

UNITED STATES OF AMERICA

v.

JOSE EMMANUEL TORRES,

        Defendant.
_____/

## STIPULATED STATEMENT OF FACTS

If this matter were to proceed to trial, the government would prove by evidence, including testimony of a cooperating witness and other witnesses with personal knowledge of the facts set forth below, audio recordings, e-mails, text messages, and other evidence that, as set forth in Count 1 of the Information, on or about November 14, 2013, in Broward County in the Southern District of Florida and elsewhere, defendant JOSE EMMANUEL TORRES (hereinafter referred to as "TORRES"), directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally, in return for being influenced in the performance of an official act, that is, TORRES did accept $6,000 in return for agreeing to assist a person with his pending federal immigration case, in violation of Title 18, United States Code, Section 201(b)(2)(A) and as set forth in Count 2, from on or about November 14, 2013 and continuing through on or about December 2, 2013, in the Southern District of Florida and elsewhere did willfully and intentionally cause a person to exceed authorized access on a computer and thereby obtain information from a protected computer, that is, information from a database operated by the DEA, and that the offense was committed for the

1

purpose of private financial gain, and in furtherance of a criminal and tortious act in violation of the Constitution and laws of the United States and of any State, specifically, F.S. § 812.014(2)(a)1, that is, the theft of $500,000 of drug proceeds, all in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B)(i) and (ii), and Title 18, United States Code, Section 2.

The government's evidence would establish that TORRES was a Gunnery Sergeant in the United States Marine Corps. From approximately January 2012 through December 13, 2013, TORRES was assigned to the Department of Defense, Defense Intelligence Agency (hereinafter referred to as "DIA"). As part of his official duties with the DIA, TORRES worked with agents from the United States Department of Homeland Security, Immigration and Customs Enforcement (hereinafter referred to as "ICE"), Customs and Border Protection (hereinafter referred to as "CBP"), and the Drug Enforcement Administration (hereinafter referred to as "DEA") collecting intelligence regarding persons who were allegedly involved in terrorism and drug trafficking. ICE, CBP, and the DEA are agencies of the United States Government.

At DIA, TORRES participated in interviews of individuals incarcerated at various federal immigration detention centers located in Florida. On several occasions between January 23, 2012 and March 2013, TORRES and federal agents met with a confidential witness (hereinafter referred to as the "CW") in order to discuss persons involved in drug trafficking and terrorism. The CW had been incarcerated in Florida due to ongoing immigration proceedings and was attempting to obtain permanent resident status in the United States.

The Narcotics and Dangerous Drugs Information System (hereinafter referred to as "NADDIS") is a nonpublic database operated by the DEA that allows the user to search a chronological history of DEA reports. The National Crime Information Center (hereinafter

referred to as "NCIC") is a nonpublic database operated by the Federal Bureau of Investigation that allows the user to search for arrest records and criminal histories, among other information. The Driver and Vehicle Information Database (hereinafter referred to as "DAVID") is a nonpublic database maintained by the State of Florida that allows users to access driver's license identity information, driver's license records, and vehicle title and registration information.

In or about April 2012, TORRES interviewed the CW at the CW's residence. During the course of the interview, TORRES informed the CW of his marital and financial problems, and TORRES asked the CW if he knew anyone who would provide him a $5,000 loan. In or about early September 2013, TORRES stated to the CW that he had used his influence with ICE to have the CW arrested on December 7, 2012.  In or about late September 2013, TORRES met with the CW and TORRES asked the CW for $10,000, which represented money the CW previously promised to pay for TORRES' help in assisting in a federal government investigation. TORRES did not say the money he was requesting was a loan.  When TORRES asked for the money, he continued to discuss the pending federal immigration case against the CW.  The CW understood TORRES to be asking him for money, or he would use his influence with ICE to have the CW arrested again.

On or about October 21, 2013, TORRES sent a text message to the CW asking for $10,000, writing to the CW that, "I promise that you will not go to jail even if I have to put my neck on the line."  On or about November 14, 2013, TORRES met with the CW in a parking lot outside of a restaurant in Davie, Florida, which meeting was consensually recorded.  TORRES discussed the pending federal immigration case against the CW, and the CW asked TORRES for assistance in his case.  The CW then provided TORRES with an envelope containing $6,000.

In or about mid-2013, TORRES told the CW that he was looking to steal a delivery of drug money or identify a stash house where they could steal drug money. On or about November 5, 2013, TORRES assured the CW that the individuals who TORRES knew, who would assist them in stealing the drug money, were trustworthy. On or about November 14, 2013, TORRES agreed to do a computer check on a government database for the CW of the names of two Colombians who would be assisting the CW in stealing the drug money (hereinafter referred to as the "Two Associates") to ensure that the Two Associates were not cooperating with law enforcement. On or about November 20, 2013, TORRES provided the CW with an email address and password in order to provide the names of the Two Associates.

On or about November 25, 2013, the CW discussed with TORRES, via the Skype internet application, the plan regarding stealing the drug money. TORRES agreed to provide a law enforcement receipt to the CW that would be provided to the owners of the money in Colombia, which would document that the money had been seized when, in fact, the money had been stolen.

On or about December 2, 2013, TORRES asked a DEA agent to conduct checks in NADDIS on the Two Associates. On or about December 2, 2013, TORRES caused the DEA agent to run the names of the Two Associates in NADDIS, which resulted in one of the Two Associates being identified as the subject of an ongoing DEA investigation. On or about December 2, 2013, TORRES sent text messages to the CW with the results of the computer checks he caused to be conducted on the Two Associates. TORRES advised that one of the Two Associates was a subject of an ongoing DEA investigation. TORRES further advised that the individual named "Carlos" was not a DEA informant, but the DEA was watching him.

On or about December 4, 2013, the CW and TORRES met in the parking lot of a

department store in Cooper City, Florida, which meeting was consensually recorded, where the CW asked TORRES to provide him with a photograph of the individual named "Carlos," who TORRES had previously advised was a DEA subject, so they could make sure it was the same person. Additionally, TORRES was told that the money to be stolen came from drug traffickers and money launderers.

On or about December 4, 2013, TORRES caused the ICE agent to conduct the check on DAVID. On or about December 6, 2013, TORRES sent the CW two photographs of individuals he identified as "Carlos." One of the photographs sent by TORRES was the correct photograph of the "Carlos" whose name was provided to TORRES, and who was the subject of a DEA investigation.

On or about January 7, 2014, TORRES sent a series of text messages to the CW requesting that the CW provide him with the names of two additional individuals associated with the CW who would be involved with them in stealing drug money. On or about January 8, 2014, the CW sent the names of the two additional individuals.

On or about January 9, 2014, the CW sent TORRES a text message requesting a copy of the receipt that TORRES was to provide after they stole the drug money. On or about January 10, 2014, TORRES sent the CW a text message containing two attachments: the first attachment was a forged Department of Justice property receipt or seizure of assets form; and the second attachment was a list of seized assets from a DEA case.

On or about January 14, 2014, TORRES met the CW in the parking lot of a supermarket in Plantation, Florida where they discussed the final details regarding the plan to steal the drug money. The CW advised that a vehicle containing $500,000 would soon be traveling down to South Florida. TORRES agreed to seize the vehicle containing the $500,000. The CW advised

that TORRES' share would be $250,000. TORRES agreed to provide a receipt to the CW that would show the money was seized. On or about January 25, 2014, the CW and TORRES communicated via text message regarding the vehicle that was to be used to transport the money. The CW wrote that the rental vehicle would be a 2012 Chevrolet Malibu, tan in color, with a Texas tag number D89X118, and that TORRES needed to write the amount of money and the date on the receipt. On or about January 25, 2014, TORRES caused the CBP agent to conduct a NCIC check of the license plate of the 2012 Chevrolet Malibu, the results of which were then sent to TORRES.

On or about January 29, 2014, TORRES met the CW in the parking lot of a supermarket in Plantation, Florida. TORRES provided the CW with an envelope containing a DEA seizure report. TORRES put on plastic gloves when he removed the report from the envelope. TORRES warned the CW not to touch the report, only the envelope, to avoid getting his fingerprints on the report. TORRES advised the CW to burn the envelope after he provided the report to him.

After receiving the report from TORRES, the CW advised that $250,000 would be paid to TORRES for TORRES providing him with the DEA seizure report. The seizure report provided by TORRES was a four-page DEA seizure form with sections that were handwritten and sections that were typed. The DEA seizure report falsely documented that a bulk cash seizure in the amount of $500,000 was made by the DEA from a 2012 Chevrolet Malibu on January 31, 2014. The DEA seizure report provided by TORRES further falsely documented that the cash seizure was the result of profits from an illegal drug trafficking business in and around the North Atlantic area.

On or about January 31, 2014, TORRES and the CW discussed in a consensually

recorded meeting that the CW was going to take possession of the 2012 Chevrolet Malibu containing the $500,000. The CW advised that once he had the car and the money, he would call TORRES to meet him at a location so that TORRES could pick up his share of the money. The CW stated that TORRES' share of $250,000 would be in a duffle bag.

On or about January 31, 2014, the CW contacted TORRES, via text message, and told TORRES to meet him in a parking lot in Dania, Florida, in order for TORRES to pick up the duffle bag containing TORRES' share of the proceeds of the allegedly stolen drug money. TORRES subsequently took the duffle bag containing TORRES' share of the allegedly stolen drug proceeds.

This is some of the evidence the government would present if this matter were to proceed to trial. The above-described events occurred from in or about November 2013 continuing through in or about January 31, 2013, in Broward and Dade Counties in the Southern District of Florida and elsewhere.

Date: 5/21/14

WIFREDO A. FERRER
UNITED STATES ATTORNEY

JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

I have read the Stipulated Statement of Facts set forth above. I believe that the above-stated facts set forth all the elements for the offense of Federal Bribery, in violation of Title 18, United States Code, Section 201(b)(2), as charged in Count 1 of the Information, and Fraud and Related Activity in Connection with Computers, in violation of Title 18, United States Code,

Sections 1030(a)(2)(C) and 1030(c)(2)(B)(i) and (ii), and Title 18, United States Code, Section 2, as charged in Count 2 of the Information. I agree with all the facts set forth in the Stipulated Statement of Facts.

Date: 5/2/14

_____
MARTIN ROTH
ATTORNEY FOR DEFENDANT

Date: 5/2/14

_____
RICHARD MERLINO
ATTORNEY FOR DEFENDANT

Date: 5/2/14

_____
JOSE EMMANUEL TORRES
DEFENDANT